We have several panels going on in the courthouse. Most of you are probably veterans of our system, but I'd like to remind you of a couple things. One is that when you have the green light, you're full running on your argument. When the yellow light comes on, if there's some second, third, or other point that you have not covered, it might be a good idea to shift gears to make sure you get it in so you're not faced with trying to bring something back up on rebuttal. When the red light comes on, please bring your argument to a conclusion, but by all means if the panel is asking you questions, please answer the question. The red light will not save you from our questions, so please answer those. The other thing is just we've improved the system in here so we hear a lot better, but it only works if you stay in that microphone. Sometimes with arguments, lawyers sort of like to do their jury thing and move around, so if you stay in front of the mic, it will pick you up well. We'll be able to hear you and those in the audience as well. With that, we call the first case, United States of America v. Angela Myers. Mr. Rothkamp? Thank you, Judge. Good morning. Morning. My name is James Rothkamp. I'm an appeal counsel for Ms. Angela Myers. First, I would ask the court's consideration in allowing the reply brief that was filed late in this matter to be filed into the record upon consideration of that. As set forth in our original brief, Judge, there is two issues which we have raised, the first being a six-level increase under 2B1.1 in regard to the number of defendants or victims alleged to have been involved in this matter with Ms. Myers. As set forth, Judge, the definition of victims in place at the time of the occurrence of the events giving rise to the charges with Ms. Myers basically stated that these victims must have felt some type of monetary loss. In 2006 and 2007, according to the guidelines, if this would have been applied, then the application of the six-level increase by the district court would have been erroneous. Now, it is recognized by counsel that in 2009, this definition did change. And had the definition, the 2009 definition, been in place in 2006, then the six-level increase may have, in fact, been proper. But it was not in effect until 2009. As acknowledged by the government in their letter dated April 29th under Pew v. United States, it's an ex post facto issue that comes into play. There is a substantial harm or significant danger to Ms. Myers in having the new law be applied because it, in fact, increased her sentence by six levels. We would ask the court's consideration in that regard into vacating the sentence that was imposed upon Ms. Myers and to remand back to the district court for resentencing. The next issue we had that we raised, Judge, was the two-level application of the vulnerable victim enhancement penalty. Judge, in this matter, the state must prove that these victims were unusually vulnerable and that the defendant knew or should have known of this vulnerability. There was no evidence in the record that Ms. Myers at any time knew or should have known that these were vulnerable victims. It is conceded that the list provided to Ms. Myers by her co-conspirator, Ms. Feo, was a list of names, Social Security numbers, dates of birth from individuals that were residents of a nursing home. So why isn't that enough? Judge, just because you're old doesn't mean you're vulnerable. Age alone is not enough. You have to be nursed, don't you? Aren't you vulnerable? By definition, you're in a nursing home because you need to be nursed. You can't take care of yourself. A lot of times, my grandfather, for instance, was in a nursing home. He was very well to take care of himself, but nobody else was in town in order to take care of him. I didn't get off the breast milk until really late in life, but just generally, it seems to me, if you need to be nursed, that means you need to be taken care of. The reason you need to be taken care of is because you're not ready to be off on your own. Yes, sir, and I would concede that. That is true, but it is an unusual vulnerability of these individuals. She had no knowledge that, and there was testimony at trial that's in the transcript that some of these individuals had dementia. Some of these couldn't talk and everything else. There was no testimony at trial to show that Ms. Ayo, at the time she delivered this list to Ms. Myers, had any conversation whatsoever about the health or the vulnerability of these individuals. There's no requirement of direct evidence. Circumstantial evidence, as you know, is probative, and even if what you say is true, that, quote, not everybody on the list may not have fit the category, although that's debatable, but all the government needed to show, did they not, was that the jury could draw a reasonable inference from the list, et cetera, et cetera, and your client would have known that. Why isn't that sufficient? We're talking about a sufficiency question. Even if there was no testimony, no direct evidence, why is that, on a standard review, why is that not sufficient probative evidence for the jury to make the finding it needed to make? Judge, I would just submit that there's no evidence that Ms. Myers herself actually knew of the condition of these individuals. She was given a list. A consensus list. Well, is that deliberate? Is that deliberate in, you know, deliberate ignorance? You know, in other words, you know, the case is a lesion. You can't just turn a blind eye to something that's evident just so later you can say, well, I didn't know. I didn't see. So, I mean, is it enough to say, well, she didn't know when the facts, the circumstances were there that a reasonable person could glean it? Why does she get to say she didn't know because nobody told me, et cetera? You follow me? Well, Judge, I think the facts and circumstances were there when the testimony was presented at the trial. At the time the list was handed to her and at the time of the commission of the acts that she was found guilty of, there's no evidence to show that she knew at that specific time. I do concede that there was testimony at trial in regard to the vulnerability of these individuals. But at the time of the commission of the crime, there was not. There was no evidence presented. But I thought there was evidence that she knew the list came from a nursing home. There was evidence that the list came, and I was not trial counsel, and I cannot speak to what went on at the trial. My appreciation of the record is that there was evidence that the co-conspirator worked at a nursing home and had communication with Ms. Mars. It's reasonable to infer that she knew her co-conspirator got the list from a nursing home. I would concede that, yes, ma'am. And how many names were on the list? One hundred names. I thought it was more than that. There was 285 victims, and government counsel can speak to that. I think there was 285 victims total. The list that she received from the nursing home had a hundred names on it. What are the odds that a hundred people in the nursing home, none of whom will be vulnerable? Remote. Counsel, as a matter of fact, it's my recollection, I know Texas does, but I would imagine it's fairly common in the states. Nearly all the state legislators have enacted legislation setting specific requirements on nursing homes and how often they have to go into the rooms, how often they have to check them, and all sorts of regulations that cover people that are committed to nursing homes as a rule simply because of their state's acknowledgment of their vulnerability and the fact that they need extra attention. I mean, that's . . . I know Texas has laws to that effect, I would imagine . . . Yes, sir. And I recognize that. I guess the crux of my argument is, Judge, is that at the time she was given the list, she did not know. And I understand whether ignorance or just didn't care, I can't answer that question. I can't get into her mind. But I understand that at the time that the list was provided to her, in all likelihood she probably did know that it came from the nursing home. But what if it didn't come from the nursing home? What if the list of names that Ms. Ayo had gotten off the Internet or something? It's the same argument. She doesn't have that knowledge at that time. Yes, but you want a list of people that aren't probably going to have income or they're going to have a Social Security record showing . . . So you need a list of people that are elderly or aged or infirm that can't work so that you can do your scheme. You don't want to file a fraudulent income tax return on someone that's making $60,000 to $80,000 a year. You want people that are infirm and not working. Yes, sir. That's part of the deal. Yes, sir. And there was testimony at trial that Ms. Myers and the co-conspirator had several conversations prior to the list being handed over. I was not a part of those conversations. I can't speak to that, so I don't know what was said. There was one other point that I would like to make in regard to my first argument is that the pre-sentence report also indicated that the individual victims, the 285 individuals were not eligible for restitution as they did not suffer a financial loss. That was set forth in the PSR and recognized. The only loss was to the IRS. The IRS paid the money. So there was one victim is our assertion. Thank you very much. All right. Thank you. You've reserved time for rebuttal should you need to exercise it.        Mr. Robbins. Mr. Robbins. Mr. Robbins. Mr. Robbins. Mr. Robbins. Mr. Robbins. Ms. Robbins. Alex Robbins. May it please the Court. On behalf of the United States. The Government at the outset wants to repeat what it stated in its 28J letter, which is that we concede that the District Court violated the Defendant's Rights under the Expos Facto Clause by imposing a six level adjustment for number of victims based on the old guidelines definition as opposed to the new one. And I want to clarify just for the record that the correct version of the guidelines would have been the 2008 guidelines because the very last crime the Defendant was convicted of committing was filing a false tax return for herself in April of 2009, which would mean that the November 2008 version that was in effect at that time should have been used. It's actually, it's immaterial whether it's that versus 2006 or 2007 because they're all the same, but the 2008 is the correct version. Bottom line, it made a substantial difference in the sentence, in the guidelines. That's correct. Ms. Meyer's level was calculated at a level 29, which gave her a range of 87 to 108 months imprisonment. Without the six level enhancement, her range would have been a 23, 46 to 57 months, at which is why we also concede that that error affected her substantial rights. What we want to make very clear, though, that we do not concede that there was anything substantively wrong with the 108 month sentence. In fact, our position is the District Court could reimpose that same 108 month sentence on the guidelines component, not the aggravated identity theft components separate. The District Court could reimpose that sentence. I misunderstood that. What do you mean there's nothing substantively wrong? A 108 month sentence for the egregious crime that Ms. Meyer's committed would have been substantively reasonable. So you're saying she would have upwardly departed from the maximum 57 month under the advisory guidelines? That's correct. And we planned, and that's why we are not conceding the fourth prong on the plain error standard because we don't want to suggest that there is anything substantively unreasonable about a sentence of 108 months for stealing the identities, not of 285 people, because there are 285 false tax returns, each of which involved three stolen identities, more than 850 people. Under Gall, we don't have that. I'm sorry, Your Honor? We don't have that option under Gall if we decide to recognize the plain error, right? If you decide to recognize the plain error, Your Honor, I think the District Court would have the option under Gall of— The District Court, this Court, would have to revamp. Of course. Of course. That's not an issue for this Court. I was confused about your 28J letter because it was raised in the reply brief, the defendant's reply brief. You said, well, we could recognize your error, but we're not obligated to. What's your position on whether we should recognize the error, even though it was raised—wasn't raised in the District Court, wasn't raised in the initial briefing in this Court? You're saying we had the discretion not to, and I didn't know which way you wanted us to exercise our discretion. I apologize for any lack of clarity in the context of a 350-word letter. Our position is you should not exercise your discretion to correct the error because the Court has not explained, as it's her burden to do, how there was any miscarriage of justice in this case, either in her opening brief or her reply brief or just now when my colleague was up here at this lecture. And the fourth thing, I thought the standard is that we don't have to exercise our discretion unless there's unfairness, affects the fairness or the integrity of the process, right? That is— I mean, you're using a term, something reasonable and whatever, but I thought it was fairness or integrity. I believe the fairness or integrity of the judicial process is one of the formulations. The one I'm—the more common one that I think comes from Milano and Puckett, the Supreme Court opinions that's been repeated by some of this Court's recent case law, is miscarriage of justice. And whatever the particular formulation of the fourth prong of plain error— We have here a guideline sentence, miscalculated, and it is what—was it against— The calculation was a sixth level enhancement. In terms of months, it was what? It would have been 87 to 108, down to 46 to 57, or up. And so—okay, so—and then as opposed to a properly calculated one, it wouldn't have included the 107, would it? That's correct. Well, how can it—why should we say, well, it's—it doesn't seem unfair or unjust for somebody to get a sentence that wouldn't have been even available if the sentence had been calculated right, unless the judge departed and didn't issue a guideline sentence? Because, Your Honor, if the analysis is that there is a miscarriage—that the fourth prong of plain error is satisfied any time there's a substantial error or a clear and obvious error that affects substantial rights, then that effectively wipes the fourth prong out of existence, which is why this Court, in its recent en banc decision on the subject in Escalante Reyes and in this Court's decision in Davis, which is not cited in the briefs but it's at 602 F. 3rd 643, makes it very clear that the fourth prong is an independent prong. In other words, any time there's a clear and obvious error that affects a defendant's substantial rights does not mean that a miscarriage of justice has occurred. It seems like the easier argument for the government is, was it raised in the reply brief and we shouldn't consider it and we don't even get into the plain error analysis? Your Honor, we don't think we can make that argument in light of this Court's decision in Whitfield and Lewis, which is a precursor to that. Lewis we cited in our 28-J letter, Whitfield is 590 F. 3rd 325. These are not jurisdictional arguments that this Court has stated— They're not jurisdictional, but—I'm sorry, go ahead. I'm sorry. This Court has stated that it has discretion under plain error to reverse judgments even if an argument has been forfeited on appeal or below. But the standard for whether we even decide to consider an argument raised for the first time in a reply brief is different from the plain error standard, is it not? We— It's much more restrictive, is it not? That is not—unfortunately, that is not my reading of this Court's decision in Whitfield. It was in the post-Booker cases, coming out of the Booker remands, the standard was extraordinary circumstances. There's some discussion in the Court's case law about whether that's the same thing as the plain error standard. At the same time, this Court's plain error doctrine became more clear on the subject that I'm addressing now, that the fourth prom is a real, meaningful prom. So essentially, by the time you get to Whitfield, this Court's plain error standard has become a real, meaningful, stringent standard that allows for reversal only in extraordinary circumstances and now matches that, I guess, the 2005-2006 standard coming out of the Booker remands. So in other words, the government's position is that, yes, this Court can address this error under the plain error standard, but that standard is properly construed under Davis, under Escalante-Reyes, as a circumstance—as a standard that allows reversal only for an extraordinary miscarriage of justice, which is not present here. The point is that we also have a lot of language that says, you know, where the error is plain, is there, it's plain, and it does substantial harm or whatever, there's a lot of cases in different areas where we say, ordinarily under those circumstances, we will exercise our discretion unless something or other. So I mean, yes, we have that language, but within that language, we have a whole lot of areas of law under which we have pretty much said, if you got the first three, we're going to find the fourth unless there's this exception or some—I mean, yes, it's stringent, but our case law has a whole lot of circumstances under which it has been read not to be perhaps as stringent as you would read it as if it was the only language out there. Yes, Your Honor, there is some language in the Court's case law that this Court has addressed recently that suggests that the fourth standard is something that is generally satisfied if the other three are. In this case, this Court has recently stated, in Davis and Escalante-Reyes and other decisions, those are the two that I've looked at carefully, that that's not true, that that loose language in this Court's case law is not the law and that, in fact, all four prongs need to be— Were those embanked cases? I'm sorry? Those embanked cases? Escalante-Reyes was an embanked case, Your Honor. Davis was a panel decision that was relied on heavily by the embanked court and explicitly reaffirmed by the embanked court in Escalante-Reyes. I think that that gets the Judge Owen's question . . . It absolutely does not. She's talking about something else. No, it's completely different. I don't think you've read our cases. This is a question of whether, if the criminal defendant does not raise an issue in their initial brief, it is forfeited in this Court, has nothing to do with plain error standard. We may exercise our discretion to consider it, but we don't use the plain error standard in deciding whether to exercise that discretion. Then if we exercise our discretion, if we decide to even look at the issue, then plain error governs. But there's a threshold issue about, since it was not raised to the reply brief, whether we even have to consider it. Judge Owen. The government is conceding. I think that that's . . . The government is conceding. I mean, you're not even arguing that. I mean, the government is conceding. The error is there and it's palpable, so you're not even arguing waiver or forfeiture that we shouldn't even recognize. The government has a sense of fairness. Sometimes this Court doesn't ask . . . In many cases, that's the end of it. The government comes in and says, you know, it's waived. It's waived for the first time, but you're not making that argument. I mean, you're conceding error, but just saying, kind of, we shouldn't exercise our discretion. If the Court will allow me to answer . . . I think I can answer all three lines of questioning here. To start with the Chief Judge's question or comment, yes, we confessed error as soon as it was brought to our attention because we represent the United States of America and it's our job to do justice. Let me stop you there. There are rare moments when the United States government comes in and stands there and, quote, confesses error, close quote. One could argue that that's a signal moment enough to otherwise get somebody over the hump in terms of whether or not the issue ought to at least be looked at because normally the government is fighting tooth and toenail for good reasons and on good ground to say, you know, no, the judge would have given the same thing, don't recognize it. Yes, it's error, but it wouldn't have made a difference. Here, the government is even making an argument, yes, it's error, but we think the judge could have upwardly departed and given even more. It just strikes me that with the concession of the error and even in hearing that, your argument that the judge could go up, it's a little different than the heartland of cases we get where, A, there's a fight over recognize or not and, B, it wouldn't have made any difference. It seems to me that it's weighing more towards not us figuring it out but vacating the sentence and sending it back and see whether you're right that the judge might go up or down or whatever happens rather than us nuancing the various cases we have out here which all say what they say, but on these facts, we've got to acknowledge error up front here, a big gap between 108 months and 46 months. You say the judge could upwardly depart on it, so I'm hard-pressed to see how no substantial difference or miscarriage of justice. The last point I'll make is that we have cases that say, even when it's raised in the replibrary, if it's an issue of law, we can recognize it and not deem the way we've got cases. The point is we've got lots of cases going all over that, to me, aren't inconsistent with each other, they just all sort of point to different facts. So what's wrong with just sending it back to the trial court? As a practical matter, Your Honor, the government has no problem with a summary vacaturing names so we can get this fenced correctly. I want to make clear that as a practical matter, there's nothing wrong with that, and in view of the fact that Ms. Myers would likely have a 2255 argument later, we would just deal with this now. The reason we are not conceding the fourth prong on plain error is related to Judge Owen's point, that this Court's standard under plain error has, in the last few years, and especially Esconde Reyes, I would point to— That's not my point, and I'm not suggesting we should not exercise our discretion. I just want you to recognize there are two different legal principles. And Judge Owen respectfully, I think, Whitfield forecloses that argument. Otherwise, we would be making the argument that we're under a post-Booker remand universe where the standard is extraordinary circumstances and not the plain error standard. But if, in fact, this Court's precedent is taken at face value from Davis and Esconde Reyes, then the extraordinary circumstances language from the post-Booker remands, which arguably used to be higher than plain error, is fully reconcilable with the plain error standard, that plain error standard is truly an extraordinary circumstances standard. It's not something that's automatically satisfied every time there's a clear, obvious error that affects substantial rights. And so coming back to the government's fundamental position here is that there is nothing unjust, there is no miscarriage of justice, about a 108th month sentence for a wide-ranging identity-theft scheme that victimized hundreds of people confined to a nursing home. There's nothing substantively wrong with that sentence. And in light of that, and given the fact that it's the defendant's burden to explain how the plain error standards are met, including that fourth prong, that we have heard nothing, I have heard nothing in the briefs or from my colleague up here to explain how there was a miscarriage of justice in the sentence itself. And so that's where we are not conceding the fourth prong of plain error because we think it's a fair sentence to be imposed by the district judge on remand because we think it's a just sentence given the egregiousness of the defendant's conduct. It may turn out to be a just sentence. I think you make a valid point. But once we get to that point, we usually have a district court saying why he didn't give a guideline sentence and explaining or giving some indicia, like you just did, of the rationale that supports his idea of why that elevated sentence is reasonable. So we still have that built into the framework. I understand that. And I think that, and Chief Judge Stewart's earlier line of questioning goes to the question whether there's a substantial, or there's an effect on the defendant's substantial rights, the third prong of plain error, which is a prejudice standard. And there's an old case from this court, pre-Booker, called Ravitch, which is discussed in the Davis case that suggests that, well, if the district judge could have given the sentence, it doesn't affect substantial rights and it's not a miscarriage of justice. Davis separates those out and says that the prejudice prong is, as Judge Stewart and Judge Benavides, you suggest, is not could the district judge have done this, it's is there a reasonable, likely, disaffected sentence. That's distinct from the question of whether it's unjust. As a non-lawyer, and if you look at it as a non-lawyer and the integrity of the system and how, what people think of the system and what people think about whether it's fair or not. And you're Joe Blow at Cox's Diner in Tyler, Texas, having a cup of coffee with an engineer and a guy that fixes air conditioners. And you're reading the paper and the paper says the judge miscalculates the guy's sentence and he should have got 23 to 41 months. But the judge gave him 107 months instead because the court thinks it doesn't make the system look bad. It's not unfair. It doesn't reflect bad on the system. And I'm thinking, and I'm sitting there at Joe's Diner and I'm saying, wait a minute, the judge screwed it up. He could, on a guideline sentence, he could only give up to 41 months. The guy got 107. My first inclination as I'm sipping that cup of coffee is, this ain't right. This is not fair. And I think that inherent in the government's admission here, and I don't mean it in a bad way. I think it reflects well on the government of trying to do the right thing. That instead of relying on this being in a reply brief, it says, hey, this is not right. This is not fair. It was calculated this. It was calculated this way. That's wrong. It's error. We're conceding that it's error. It's not fair. And, but your argument is, but it's not that unfair that it reaches this fourth thing. And to me, it's really, really hard in terms of what do the people think of our system and, and think of the judiciary and think of the way we sentence people and how we treat people if we just, if we just double somebody's sentence. If I could respond to that quickly and make one practical point in summation, obviously it depends very much on how you frame the question. I think our position is, is if you went to a layman or lay woman in Joe's diner, drinking a cup of coffee and told them that a woman who victimized over a hundred severely disabled people from a nursing home and stole the identities of more than 850 people to file hundreds of marginal returns, got a sentence of nine years imprisonment for those crimes. Like I'm separating out the identity theft crimes. Nine years in prison and failed to make a technical argument and then came up to court and said there was a miscarriage of justice, that I got nine years in prison. I think a lot of people, most people I know would not have any trouble saying that's a just sentence. It wouldn't bother me either if I understood that, that that was the basis for it. And that's why we have that district judge making those explanations. If I could finish on my practical point, I think that this court, yes, this is an example where the defense has come up with a valid argument in a reply brief. But whatever standard this court chooses to articulate, if any, consistent with this court's case law, needs to be a standard that works for the 99% of cases where frivolous or at least unmeritorious arguments are thrown in a reply brief and don't waste the judiciary's time in having to deal with them, which is why the plain air standard and all four prongs of it are so important. Thank you. Thank you. All right. We hear back from you, Mr. Hopkins. We have substantial harm to an individual that is entitled to a 46 guideline sentence of 46 months when she receives a sentence of 108 months. The government keeps saying that these 280 or these 100 residents of this Nosen home has been victimized. But as the pre-sentence report stated, they suffered no loss. I think the judge asked me earlier, you know, these people are individuals that don't file tax returns anyway. That's who you want. They suffered no harm. The loss came from the IRS, the United States government. It was not these 285 individuals that would not have got a tax return either. The substantial harm is the sentence, 108 months compared to a sentence of a minimum guideline range of 46. That's the harm. Part of the government's objective is to insulate itself from you going, if we sent it back, from you going back down saying the government can't now make this up for departure argument because when they were up on the field, you know, they basically acknowledged there was an error and so it can't happen. And counsel opposite astutely has made his argument that you can't take this tape and take it to the district court and say, aha, you know, the government now can't argue for a substantive 108, you know, months because they conceded that error. I mean, it was very carefully articulated on the points that he's making to acknowledge the error, but at the same time, they're still arguing substantively if she got 108 months because the judge upwardly departed, you know, that's not, quote, a miscarriage in justice. So assuming we sent it back, on the other hand, you're arguing only the IRS is the victim here, so it just kind of depends on how that all sells, an argument can be made that the people in Ersingholm were victims as well, but I guess my point is that at best, it may go back to the district court to sort it all out on a fresh deck. I mean, that may be what happened, I'm not saying it is, but that may be what happens. It goes back and the judge can absorb your arguments about the IRS is the only victim, and on the other hand, the government's argument is that she ought to get 108 under the correct guidelines. You acknowledge that possibility? Yes, sir. Okay. Anything further? No, sir. Thank you. All right. We're good. You're not appointed, you're retained counsel, right? Yes, sir. Okay. Just wanted to make sure. All right.